Eleazer E. Rand and Paula Rand v. Commissioner.
Rand v. Commissioner
Docket No. 70472.
United States Tax Court
T.C. Memo 1960-1; 1960 Tax Ct. Memo LEXIS 287; 19 T.C.M. (CCH) 1; T.C.M. (RIA) 60001; January 11, 1960
*287 Eleazer E. Rand, hereinafter referred to as petitioner, sustained a loss in 1953 on the disposition of the assets of his business (a food market) in a single, isolated transaction. The disposition was, in fact, a sale. Petitioner maintains that such disposition was by abandonment. Held, that whether by sale or by abandonment, the loss sustained was not allowable as a net operating loss carry-over to the years 1954 and 1955 because not attributable to the operation of a trade or business regularly carried on by petitioner within the meaning of section 122(d)(5) of the Code of 1939. Eleazer E. Rand, pro se, 7635 Washington Lane, Elkins Park, Pa. Albert Squire, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined deficiencies in income tax *288 against petitioners for the taxable years 1954 and 1955 in the respective amounts of $685.14 and $849.42. The issue to be considered is whether or not a loss sustained by petitioner in the year 1953, on the disposition of the assets of his business, is allowable as a net operating loss deduction for carry-over purposes within the meaning of section 122(d)(5) of the Code of 1939. Findings of Fact Petitioners filed joint income tax returns for the years 1953, 1954, and 1955. Their returns for the years 1954 and 1955 were filed with the district director of internal revenue, Philadelphia, Pennsylvania. At the beginning of the year 1953, petitioner Eleazer E. Rand (hereinafter called the petitioner) owned and operated a retail food market at 531 West McDowell Road, Phoenix, Arizona, called "Foodville." The market handled groceries, meats, and produce. The petitioner had been seriously injured in an automobile accident early in December 1952. He was hospitalized for about three weeks. Later he was confined to a wheelchair. About the end of January 1953, he was able to walk but needed crutches. In Phoenix, normally, business was good in the winter but poor in the summer. It became *289 apparent that the winter business would not be sufficient to carry it through summer losses, and this condition was made even worse because of petitioner's accident. He saw no real hope of carrying on the business successfully and became very much depressed. His wife had not been trained to operate the store. In February 1953, the petitioner offered the business for sale but received no offers. He was unable to meet his bills, and early in March 1953 stopped paying them entirely. On March 12, 1953, a meeting was held of petitioner's creditors. The creditors agreed to "freeze" the balances due on outstanding bills for at least two weeks. Petitioner agreed with his creditors as follows: to appoint Elden Fisher as operating manager of Foodville, under the supervision of Frank Hill, manager of Wholesalers Credit Association; to maintain a petty cash fund of $500 in the store and deposit $2,000 in a separate bank account, subject to withdrawal by checks signed by both Fisher and Hill; to pay Fisher a salary of $120 per week for two weeks, petitioner to receive a salary of $125; and petitioner to devote most of his time towards securing a buyer for Foodville. The foregoing understandings *290 were reduced to writing and signed by petitioner and members of a committee of his creditors. They agreed to meet again after two weeks to discuss further the operation of Foodville. On March 12, 1953, petitioner gave the keys to the store to someone representing his creditors and gave up control of his bank account to the creditors' committee. On March 20, 1953, petitioners entered into a written agreement of Escrow Instructions with Thomas F. Hefty and Helen A. Hefty. This agreement prescribed the steps to be taken in the bulk sale of petitioner's assets in Foodville to the Heftys. The agreement refers to the petitioners as "The VENDORS." The signatures of petitioners to this agreement are each entered next to the word "VENDOR." The escrow agreement provided for a bill of sale to the Heftys, to be executed by the petitioners and referring to the Foodville store and assets as belonging to the Rands. In the escrow agreement, the petitioners agreed with the Heftys that petitioners would pay the following taxes and costs: Cith of Phoenix Sales Tax, State of Arizona Sales Tax, State Unemployment Insurance Tax, Federal Social Security Tax, Federal Withholding Tax, One-half of *291 the Escrow Fee, One-half of the cost of advertising, One-half of the cost of recording the notice of Sale in Bulk. The escrow agreement provided that Maricopa County Unsecured Personal Property Taxes for the year 1953 were to be adjusted between the petitioners and the Heftys. It provided for the cancellation of insurance by the petitioners. The escrow agreement instructed the escrow holder, Wholesalers Credit Association of Arizona, to receive from the Heftys the funds for the purchase of the Foodville assets, and to pay from such funds secured creditors (of Rand) and then general creditors (of Rand), proportionately, from any balance remaining. If sufficient funds were on hand to pay all general creditors in full, the agreement instructed the escrow holder that any balance remaining was the property of the petitioners. The escrow agreement provided that possession of the business was to be given to the Heftys on March 23, 1953. They were to pay the purchase price to the escrow holder on the same day. The escrow agreement stated that the lease, dated February 21, 1951, was in the name of the petitioners. It instructed the escrow holder to arrange for the assignment of the *292 lease to the Heftys. On or about March 23, 1953, the petitioners executed a Bill of Sale to the Heftys of all of their Foodville assets. The Bill of Sale lists the assets and refers to them as the petitioners' assets. On or about March 23, 1953, the petitioners executed a Notice of Sale In Bulk with respect to all of their Foodville assets. The notice stated that it was given pursuant to the Bulk Sales Act; that the petitioners were doing business as Foodville; that they intended to sell in one transaction all of their merchandise, goods, wares, stock in trade, fixtures and equipment, wine and beer license, and good will and name of said business to the Heftys. The notice stated that the sale was to be completed on April 7, 1953, and that all creditors should present their claims on or before that date to Frank Hill, c/o Wholesalers Credit Association of Arizona. On the date of disposition of the Foodville assets, their adjusted bases to petitioner were as follows: Asset
Adjusted Basis
Equipment
$15,566.77
Leasehold Improvements
87.72
Beer and Wine License
3,000.00
Merchandise Inventory
9,418.15
Total
$28,072.64
Petitioner sold the above assets to *293 the Heftys for the following amounts: (1) $9,418.15 for the merchandise inventory; (2) $12,500 for the other assets. With his joint income tax return for the year 1953, petitioner filed a schedule entitled "SCHEDULE OF SALE OF BUSINESS." This schedule states that the Foodville assets were sold on March 21, 1953. It shows the amounts received on the sale as $9,418.15 for the merchandise, and $12,500 for the equipment, leasehold improvements and beer and wine license. The transaction disposing of petitioner's assets in Foodville on March 23, 1953, to Thomas F. Hefty and Helen A. Hefty was a sale. The inventory of $9,418.15 was sold without gain or loss. Petitioner sustained a loss of $6,154.49 from sale of the remaining assets which had been used in the business. Such remaining assets were not assets in which petitioner traded in the ordinary course of business. Petitioner did not abandon the Foodville assets. The $6,154.49 loss which petitioner sustained from the sale of the assets used in the Foodville business was not attributable to the operation of a business which he regularly carried on, within the meaning of section 122(d)(5) of the Code of 1939. All of the gross *294 income received by petitioners in the year 1953 was derived from trades or businesses which they regularly carried on. Opinion The only issue before us is whether or not the loss, described in our findings, on disposition by petitioner of his food store assets is allowable as a net operating loss deduction for carry-over purposes within the meaning of section 122(d)(5) of the Code of 1939. [1]
Petitioner does not *295 question the view that he is not entitled to a carry-over if the disposition of his assets was accomplished by sale. He does not claim that he ever traded in assets of the type giving rise to the loss, and it is obvious, upon the facts# that the transaction was an isolated one, not attributable to the operation of a business regularly carried on. The authorities are legion to this effect. See, for example, Joseph Sic, 10 T.C. 1096 (1948), affd. 177 F. 2d 469 (C.A. 8), certiorari denied 339 U.S. 913; Hartwig N. Baruch, 11 T.C. 96 (1948), affd. 178 F. 2d 402 (C.A. 2); Charles Weill, 17 T.C. 318 (1951). Since we have found as a fact that the transaction was a sale, it follows that we must sustain respondent's determination. Petitioner argues vigorously that the transaction was an abandonment rather than a sale. We cannot agree with his version of the facts, but for completeness we add that even if we assume, arguendo, that there was an abandonment, nevertheless we must hold, under the circumstances here presented, that the loss was not attributable to the operation of a trade or business regularly carried *296 on within the meaning of section 122(d)(5). See Gus Corey, 29 T.C. 360, 364-5 (1957). Decision will be entered under Rule 50. Footnotes
1. Sec. 122. NET OPERATING LOSS DEDUCTION. (a) Definition of Net Operating Loss. - As used in this section, the term "net operating loss" means the excess of the deductions allowed by this chapter over the gross income, with the exceptions, additions, and limitations provided in subsection (d). * * *
(d) Exceptions, Additions, and Limitations. - The exceptions, additions, and limitations referred to in subsections (a), (b), and (c) shall be as follows: (5) Deductions otherwise allowed by law not attributable to the operation of a trade or business regularly carried on by the taxpayer shall (in the case of a taxpayer other than a corporation) be allowed only to the extent of the amount of the gross income not derived from such trade or business. * * *↩